**The below described is SIGNED.**

**Dated: November 26, 2007**

**JUDITH A. BOULDEN
U.S. Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>LAWRENCE RICK SCHAFER,<br><br>           Debtor. | Bankruptcy Number: 06-23099<br><br>Chapter 7 |
| KEVIN FRAZIER,<br><br>           Plaintiff,<br><br>v.<br><br>LAWRENCE RICK SCHAFER,<br><br>           Defendant. | Adversary Proceeding No. 06-2521<br><br>Judge Judith A. Boulden |

**MEMORANDUM DECISION**

**I. INTRODUCTION**

During the late 1990s, Internet-based companies (commonly referred to as "dot-coms") were formed and funded at an accelerated pace. Easy accessibility to venture capital combined with rapidly rising stock values enticed many savvy investors, as well as less experienced

I:\LAW\OPINIONS\Opin0521.wpd

individuals, into the speculative dot-com world. The subsequent dot-com "bust" resulted in widespread economic loss. This adversary proceeding arises from such losses sustained by two individuals.

Kevin Frazier (Frazier) and Lawrence Rick Schafer, the debtor herein (Schafer), worked together at Delta Airlines. In 1999, the two men invested in Worldwide Internet Partners Funding Group (Worldwide), a California venture capital group providing start-up capital for internet businesses. Frazier invested $20,000 in Worldwide and loaned Schafer $52,000, as evidenced by a promissory note, to help Schafer preserve his investment in Worldwide. Schafer subsequently defaulted on the note and Frazier filed a complaint in state court to collect the full amount of the promissory note. A default judgment was entered in favor of Frazier on June 17, 2003 in the amount of $72,000 together with statutory interest at 10% per annum.

Schafer filed a voluntary chapter 7 petition in August 2006 and listed on his schedules a nonpriority unsecured claim held by Frazier in the amount of $71,691. Frazier timely filed a complaint objecting to the dischargeability of the debt under 11 U.S.C. § 523(a)(2)(A).[1] A trial was conducted before the bankruptcy court to determine (1) whether a state statute of limitations and res judicata precluded Frazier from pursuing his nondischargeability complaint and (2) whether the debt owed by Schafer to Frazier is nondischargeable under § 523(a)(2)(A).

Having considered the stipulated facts, the credibility of the witnesses, the exhibits received, the arguments of counsel, and having made an independent review of applicable law, the Court hereby enters the following Memorandum Decision containing Findings of Fact and

---

[1] Future statutory references are to title 11 of the United States Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), unless otherwise noted.

Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## II. FINDINGS OF FACT

Frazier was transferred by Delta Airlines from Atlanta, Georgia to Salt Lake City, Utah in 1993. In 1998, Frazier began working in the company's "airport group" with Schafer and a small number of other Delta employees. Employees in this work group shared a relatively open work space where they could easily observe each other's actions and hear each other's conversations. During 1998 and 1999, Frazier and his co-workers observed Schafer actively trading penny stocks on the Internet while at work and sometimes overheard Schafer talking about the amount of money he was making as a result of his trades.

Sometime before April 1999, Schafer's girlfriend, Sharon Allred, told him about a new investment opportunity with the California venture capital group Worldwide. Schafer traveled to San Francisco to investigate Worldwide and observe the operations of several of the dot-com companies in which Worldwide was investing.

After returning from his California trip, Schafer enthusiastically approached several co-workers at Delta to invite them to invest in Worldwide. Frazier, who had recently obtained funds from the sale of his home in Atlanta, then approached Schafer and asked him about the investment opportunity. Following a series of short conversations with Schafer, Frazier decided to invest $20,000 in Worldwide. Before that, Frazier's sole investment experience consisted of purchasing and selling real estate with the advice and help of his mother and sister. Frazier had no prior venture capital experience.

On Friday morning, May 7, 1999, Frazier presented Schafer with a cashier's check drawn

on his credit union in the amount of $20,000 made payable to Sharon Allred.[2] Schafer and Frazier left the office briefly to wire the funds to Worldwide, but the bank they attempted to use refused to complete the wire transaction because Frazier's check was made out to Ms. Allred. Frazier and Schafer returned to the office without transferring the funds.

Approximately one hour later, Schafer approached Frazier and indicated that he urgently needed to wire $100,000 to Worldwide. Schafer indicated that a total of $100,000 was needed or Schafer, Frazier and others would lose their priority with Worldwide resulting in either a loss of their investments or a greatly diminished profit. Schafer indicated, however, that he was $52,000 short of the required amount. Schafer asked Frazier if he would be willing to increase the amount of his investment, but Frazier refused because $20,000 was all that he wanted to risk in this kind of investment. Schafer then explained that his money was tied up in a brokerage account which he could not access quickly. Schafer asked Frazier if he would loan him $52,000 to complete the transaction.

Though the evidence is contradictory, Schafer either stated that he had $60,000 in his brokerage account but needed a short period of time simply to complete the transactions to liquidate the funds (Frazier's version), or Schafer stated that he would liquidate funds from his brokerage account if Frazier made the loan, implying that he needed time for the account to increase in value (Schafer's version). Under either version, Schafer promised to repay Frazier $60,000 within two weeks using funds from his brokerage account, and Schafer intended that Frazier rely upon his representations regarding his ability to do so. Frazier requested some time

---

[2] Frazier's cashier's check was made payable to Ms. Allred at Schafer's request because Schafer intended to wire the money to California through Ms. Allred's bank account.

to consider the proposal.

Shortly after lunch, Frazier again met with Schafer to discuss the transaction and agreed to make the loan if Schafer would sign a promissory note and repay the $60,000 using the funds from his brokerage account within two weeks, and Schafer agreed. Regardless of which version of Schafer's statements regarding the contents of his brokerage account is correct, the Court finds that Frazier relied upon Schafer's representation that he had the ability to repay the loan within the agreed time, and that such representations were material. The two men drove together to Frazier's credit union where Frazier deposited $25,000 into his account (redepositing Frazier's original $20,000 cashier's check, plus an additional $5,000 obtained by Schafer from Ms. Allred) which, when added to other funds in the account, were sufficient for the investment. Schafer then instructed Frazier and the credit union to wire $77,000 to "Silicon Valley Millennium Partners, Inc." via Santa Monica Bank to complete the transaction with Worldwide.

Over the weekend, Frazier drafted a promissory note which Schafer then executed on Monday. Pursuant to the terms of the note, Schafer agreed to pay Frazier $60,000 in guaranteed funds on or before May 28, 1999, three weeks after the money was loaned.[3] Schafer further agreed that if the $60,000 was not paid as stipulated, Frazier could convert the unpaid funds to an investment in Worldwide or hold Schafer's personal and real property as collateral until the funds were paid in full.

Schafer failed to repay the loan by the May 28th deadline. Within a week of the missed deadline, Frazier began asking Schafer about repayment of the loan but was told by Schafer that

---

[3] The $60,000 represented the full amount of Frazier's loan plus interest until the due date of the promissory note. Frazier voluntarily extended the due date from two to three weeks based upon his perception of the complexity Schafer might encounter in liquidating his brokerage account.

he did not have the funds. Frazier was then reassigned by Delta Airlines to work in Europe for a few weeks and the two men lost contact. By the end of the summer, Schafer no longer worked for Delta.

Conflicting testimony was presented at trial regarding the value of Schafer's brokerage account several months after the May 28th deadline, with Schafer indicating that the value reached $80,000 but that for some reason he never liquidated the account until the account lost most of its value. But Schafer also testified in his deposition and at trial that the value of his portfolio on May 7, 1999 was less than $10,000[4] and that his only other asset at the time, a savings account, contained approximately $1,000.[5] Schafer also testified regarding the extreme

---

[4]    In his April 9, 2007 deposition, Schafer testified as follows:

   Q:   And do you recall the average level of your portfolio value during that period of time, the late '98 to mid-'99 period of time?
   A:   I couldn't tell you what an average was.
   Q:   Would it, to the best of your recollection, be somewhere in the 10 to $20,000 range at [that] time?
   A.   Not that high, no.
   Q:   So it would be maybe in the 5 to $15,000 range?
   A:   I would say 5 to maybe 8,000, 9,000.
   Q:   So the average –
   A:   Probably never got to 10,000.

Schafer deposition, page 61, lines 1-11.

[5]    Schafer testified further in his April 9, 2007 deposition:

   Q:   Okay. Now, around this period of time, other than your penny stock account, did you have other investments?
   A:   No.
   Q:   Did you have other bank or credit union accounts?
   A:   No. I had a bank and credit union account – or credit union account.
   Q:   And that account was just – did it just primarily hold your earnings, and that was your living expenses account?
   A:   A little bit of savings, yes.
   Q:   Do you recall the level of your savings at that time?
   A:   Probably no more than a thousand dollars.

volatility of penny stocks.

The Court finds that if Schafer represented to Frazier that his brokerage account balance was $60,000 at the time of the loan, that statement was false. If Schafer did not actually make a false statement regarding the current balance in the account, the Court finds that it was unrealistic and reckless for Schafer to expect his brokerage account, which consisted entirely of penny stocks, to increase in value from $10,000 to $60,000 by May 28, 1999, just three weeks later. The Court further finds that Frazier's lack of venture capital experience, combined with Schafer's statements in the workplace regarding the amount of money he was making through penny stock trades, led Frazier to justifiably rely on Schafer's representation that he could liquidate the stocks in his brokerage account and repay Frazier $60,000 within two weeks.

### III.  CONCLUSIONS OF LAW

**A.  Statute of Limitations and Res Judicata**

At trial, Schafer argued that Frazier's claim for nondischargeability was barred by operation of a state statute of limitations and res judicata.[6] Specifically, Schafer asserted that Frazier knew shortly after May 28, 1999 that Schafer did not have the money to repay Frazier $60,000 and that any action to collect must have included allegations of fraud or such a cause of action would be lost. Schafer made an oral motion to dismiss the adversary proceeding on the basis that Utah's three-year statute of limitations for fraud expired long before Frazier filed his

---

Schafer deposition, page 80, lines 6-20.

[6]   This issues was framed in the pre-trial order as whether Frazier was collaterally estopped to maintain this action because he previously litigated the liability issue in state court without raising any claim of fraud regarding the transaction. The Court deems the issue in the pre-trial order to have been restated by Schafer as argued at trial.

breach of contract complaint.[7] Frazier countered that the only applicable statute of limitations is the one provided under Bankruptcy Rule 4007(c), which states that "[a] complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days following the first date set for the meeting of creditors under § 341(a)."[8]

The Tenth Circuit addressed this precise issue in *Resolution Trust Corporation v. McKendry.*[9] In *McKendry*, the Resolution Trust Company (RTC) had obtained a deficiency judgment prior to *McKendry's* bankruptcy filing that established both the existence and the amount of a debt owed to it by McKendry, but the complaint did not plead fraud. The question before the bankruptcy court was whether the RTC could attempt to prove that the established debt was nondischargeable under § 523(a)(2)(A) due to fraud. The bankruptcy court and the district court both concluded that the RTC's dischargeability action for fraud was barred by the state statute of limitations. Relying upon the Supreme Court's analysis in *Brown v. Felsen*,[10] the

---

[7]   Although Frazier obtained a default judgment in state court in the amount of $72,000 plus interest, the Court finds that the amount appropriately at issue in this nondischargeability action is $60,000 plus interest (representing the full amount of Frazier's loan plus interest until the due date of the promissory note).

[8]   There is no dispute in this case that Frazier's nondischargeability complaint was filed within the period established in Rule 4007(c).

[9]   *Resolution Trust Corporation v. McKendry (In re McKendry)*, 40 F.3d 331 (10th Cir. 1994).

[10]   *Brown v. Felsen*, 442 U.S. 127 (1979). The petitioner in *Brown*, a guarantor for Felsen and Felsen's car dealership, guaranteed a bank loan that financed the dealership. The lender brought a collection suit against Brown, Felsen, and the car dealership in Colorado state court. Brown answered and cross-claimed against Felsen and the car dealership alleging that Felsen induced Brown to sign the guarantee by misrepresentations and non-disclosures of material facts. The parties settled the litigation by a stipulation that did not indicate the basis for the suit. After judgment was entered on the stipulation, Felsen filed for bankruptcy and Brown sought to establish that the debt was nondischargeable because it was the product of Felsen's fraud. On appeal, the United States Supreme Court recognized that issues presented in a state court action on a debt are quite different from those presented in an action to prevent discharge and concluded that Congress intended certain dischargeability actions, including those arising

Tenth Circuit reversed and remanded, concluding that "the bankruptcy court could consider evidence extrinsic to the state court record to determine the true nature of the underlying debt."[11] *McKendry* reasoned that the only manner in which the state statute of limitations is relevant is whether a plaintiff sought to enforce the debt against the debtor within the limitations imposed by state statute. The question of the dischargeability of the debt, however, was governed solely by the 60-day statute of limitations for filing complaints to determine dischargeability of debts, and not the state statute of limitations for fraud.[12] If the state statute on limitations is irrelevant for purposes of the determination of dischargeability, then the fact that it expired prepetition is likewise irrelevant. The timeliness of filing an action on the dischargeability of Schafer's debt in this case is governed by Rule 4007(c). Since it is undisputed that Frazier filed his complaint within the sixty day period provided by the rule, he is entitled to pursue this dischargeability complaint. Frazier's motion to dismiss is therefore denied.

**B. Nondischargeability Under § 523(a)(2)(A)**

Section 523(a)(2)(A) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement

---

under § 523(a)(2), to be heard and determined by bankruptcy courts.

[11] *McKendry*, 40 F.3d at 334.

[12] *Id.* at 337.

respecting the debtor's or an insider's financial condition. . . . [13]

To prevail in this matter, Frazier must establish by a preponderance of the evidence that Schafer obtained the $52,000 loan under false pretenses, by making a false representation, or by committing actual fraud.[14] Frazier must also establish that he justifiably relied on Schafer's representation.[15] Justifiable reliance is satisfied "if the falsity of the representation relied upon is not patent from 'a cursory examination or investigation.'"[16]

In *Field v. Mans*, the United States Supreme Court established that the terms within § 523(a)(2)(A) are to be interpreted according to their common understanding at the time the statute was enacted.[17] Courts therefore look to the definition of fraudulent misrepresentation found in the Restatement (Second) of Torts to define false representation and actual fraud within the meaning of § 523(a)(2)(A).[18]

The common law elements of fraudulent misrepresentation are (1) a misrepresentation of fact, opinion, intention or law; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) upon which the plaintiff justifiably relies.[19] Fraudulent

---

[13] 11 U.S.C. § 523(a)(2)(A).

[14] *See Grogan v. Garner*, 498 U.S. 279, 291 (1991).

[15] *See Field v. Mans*, 516 U.S. 59, 73-75 (1995).

[16] *Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 686 (10th Cir. BAP 2006) (citing *Field v. Mans*).

[17] *Field v. Mans*, 516 U.S. at 70.

[18] *See Daniels v. Clark (In re Clark)*, 2002 WL 1821600 (10th Cir. BAP 2002); *accord Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 782 (10th Cir. BAP 1998).

[19] RESTATEMENT (SECOND) OF TORTS § 525 (1976).

misrepresentation also requires an intent to deceive, which may be inferred from the totality of the circumstances and includes reckless disregard of the truth.[20] In this case, Schafer intentionally misrepresented his ability to repay the $52,000 loan from his brokerage account in order to induce Frazier to loan him the funds which were ultimately lost. Frazier's reliance upon that representation was justifiable given Frazier's lack of investment experience, his prior observation of Schafer's abilities to fund and trade in his brokerage account, and the speed with which Schafer wanted the transaction consummated. Frazier's cursory examination of Schafer's representation of his ability to repay the loan from his brokerage account was sufficient under these circumstances. The Court therefore concludes that Schafer obtained money by false pretenses, a false representation, or actual fraud within the meaning of § 523(a)(2)(A).

However, § 523(a)(2)(A) also provides that a debt is nondischargeable to the extent that money or property is obtained by false pretenses, a false representation, or actual fraud, <u>other than a statement respecting the debtor's or an insider's financial condition</u>. Schafer asserts that any statements he made regarding his ability to repay the loan from his brokerage account were statements respecting his financial condition and therefore Frazier has no cause of action under § 523(a)(2)(A). The Tenth Circuit established the definition of "financial condition" in *Cadwell v. Joelson*[21] as follows: "Statements that present a picture of a debtor's overall financial health include those analogous to balance sheets, income statements, statements of overall financial position, or income and debt statements that present the debtor or insider's net worth, overall

---

[20] *See Wolf v. McGuire (In re McGuire),* 284 B.R. 481, 493 (Bankr. D. Colo. 2002); *see also Kukuk*, 225 B.R. at 787; and *Daviscourt*, 353 B.R. at 685.

[21] *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700 (10th Cir. 2005)

financial health, or equation of assets and liabilities."[22] Fraudulent statements relating to overall net worth are dischargeable under § 523(a)(2)(A). Fraudulent statements relating to specific assets belonging to the debtor are non dischargeable under § 523(a)(2)(A).[23]

In this case, Schafer represented to Frazier that he would pay Frazier $60,000 from his brokerage account on or before May 28, 1999 in exchange for the $52,000 loan. Schafer's representation of his ability to repay the loan from the account was a statement relating to a specific asset (his brokerage account) rather than to his overall net worth. Accordingly, Schafer's representation is not a statement respecting his financial condition within the meaning of § 523(a)(2)(A).

## IV. CONCLUSION

For the reasons stated above, the Court determines that Frazier has met his burden under § 523(a)(2)(A) by a preponderance of the evidence, and the debt owed by Schafer in the amount of $60,000 plus prejudgment interest as set forth in the default judgment is nondischargeable. A separate Judgment will be issued in accordance with this Memorandum Decision.

---

[22] *Id.* at 714.

[23] *Id; see also, Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 615-616 (Bankr. D. Utah 2002).

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the

Bankruptcy Noticing Center to each party listed below.

Chris L. Schmutz
Schmutz & Mohlman
533 West 2600 South
Suite 200
Bountiful, UT 84010
    *Attorney for Plaintiff*

James C. Haskins
Ryan M. James
Haskins & Associates
357 South 200 East
Suite 300
Salt Lake City, UT 84111
    *Attorney for Defendant*

_____